UNITED STATES DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ALEMEWORK AMBELLU** *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:18-cv-02177 (TNM) |
| **RE'ESE ADBARAT DEBRE SELAM KIDIST MARIAM, THE ETHIOPIAN ORTHODOX TEWHADO RELIGION CHURCH** *et al.*, | |
| Defendants. | |

<u>**MEMORANDUM OPINION**</u>

For years, two rival factions have fought bitterly for control over the Re'ese Adbarat Debre Selam Kidist Mariam Ethiopian Orthodox Tewhado Church. After starting in the local courts, this fight has now been brought here by dozens of former parishioners (the "Parishioners"). They claim that a group of current members and priests conspired to take control of the Church, its operations, and its assets. Alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, and related tortious acts, the Parishioners filed this suit against the Church and dozens of its members (collectively, the "Current Leaders").

The Current Leaders have moved to dismiss these claims. They argue that the First Amendment's Free Exercise Clause prohibits the Court from resolving this dispute, as it involves inherently religious matters. The Court agrees in part. It is barred from hearing *some* of the Parishioners' arguments and will dismiss these for lack of subject matter jurisdiction. The Current Leaders also contend that the Parishioners have failed to plead sufficiently their RICO allegations. Again, the Court agrees, and it will dismiss the Parishioners' RICO allegations for

failure to state a claim.  And it declines to exercise supplemental jurisdiction over the Parishioners' remaining claims.  The Court will therefore grant the Current Leaders' motion to dismiss.

## I.

The origins of this dispute are unclear.  The Parishioners suggest that, "beginning in around 2012, various controversies over Church governance arose."  Am. Compl. 32, ECF No. 6.  Akilu Habte, one of the Current Leaders, alleges that he and other Church members had "serious concerns about the misconduct of several of the [Church's] Board of Trustees members."  *Id.*, Ex. A, ECF No. 6-1, at 2.[1]  The Board members, Mr. Habte contends, "remained on the Board beyond the limits of their terms," "failed to conduct elections in 2012 or 2013, in violation of the [Church's] bylaws," terminated employees and clergy members without cause or process, and impermissibly altered the Church's bylaws.  *Id.* at 2-4.

Perhaps because of these concerns, "in 2013 a number of other members of the congregation formed [a] Committee, led by Defendant Akilu Habte, which decided to take over control of the Church."  Am. Compl. 32.  They allegedly did so without the Parishioners' knowledge.  *Id*.  Over the next two years, the Parishioners contend, the Committee "held a number of regular meetings for the express purpose of conspiring to devise a scheme to obtain control of the money and property of the Church by means of false or fraudulent pretenses, representations and promises."  *Id*.

Then, at the end of Church services on a Sunday in 2015, Mr. Habte allegedly

---

[1] The Court notes that Mr. Habte's statements were attached by the Parishioners as an exhibit to their First Amended Complaint.  These statements are therefore "a part of the pleading for all purposes."  Fed. R. Civ. P. 10(c).  The Court relies on them only to provide background, and not to discredit the Parishioners' factual allegations.  *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015).

"announced that the serving members of the Church's Board of Trustees . . . were dismissed."
*Id*. The Parishioners believe that, "through false or fraudulent pretenses and representations,"
Mr. Habte appointed an interim Board that assumed control of the Church. *Id*. at 32-33. Since
this appointment, the interim and current Boards have purportedly denied the Parishioners access
to the Church and its assets. *Id.* at 33.

The Parishioners argue that the Current Leaders used false or fraudulent pretenses to
obtain control of the Church and its financial assets. *Id*. at 36. They "provided broad and
repeated notice to all Church Members" of the Committee's "intention to hold a vote to dismiss
the elected members of the Board of Trustees" and replace them with an interim Board. *Id*. But
no such vote occurred. *See id.* at 38. Instead, the Committee members, "along with other groups
within the Church," allegedly decided to dismiss the Board unilaterally and replace it with an
interim Board. *Id*.

These and other actions, according to the Parishioners, constitute a conspiracy to commit
civil RICO violations by wresting control over the Church through fraud. *Id*. at 36-43. The
Parishioners also allege negligent and intentional infliction of emotional distress, conversion,
unjust enrichment, negligence, and breach of fiduciary duties. *See id*. at 44-55.

The Current Leaders have moved to dismiss these claims for two reasons. First, they
contend that the Court lacks subject matter jurisdiction over the case. The First Amendment,
they suggest, bars judicial resolution of the parties' fight because the Court's review "would
require an examination of ecclesiastical cognizance and Church governance." Defs.' Mot. to
Dismiss ("Defs.' Mot."), ECF No. 9, at 16.[2] And the Free Exercise Clause forbids the Court
"from interpreting standards of ecclesiastical conduct or examining a church's financial affairs."

---

[2] Citations are to the page numbers generated by this Court's CM/ECF system.

*Id*. at 17.

Second, the Current Leaders contend that the Parishioners have failed to plead sufficiently their RICO claims. *Id*. at 19. They argue that allegations of a conspiracy to commit fraud are subject to Federal Rule of Civil Procedure 9(b). *Id*. Rule 9(b) requires that the "circumstances constituting fraud or mistake" be stated "with particularity." Fed. R. Civ. P. 9(b). The requisite particularity, the Current Leaders urge, is lacking from the Parishioners allegations. Defs.' Mot. at 19. And even if Rule 9(b) does not apply, they argue, the Parishioners' claims of fraud "do not constitute a pattern of racketeering" as required by the RICO statute. *Id*. These claims therefore warrant dismissal. *See id*. at 27-29. The Current Leaders also contend that if the Court dismisses the RICO allegations, it should dismiss the Parishioners' remaining claims and decline to exercise supplemental jurisdiction. *Id*. at 30-31.

The parties submitted thorough briefing on these issues and presented oral arguments. The Parishioners' claims and the Current Leaders' Motion to Dismiss are now ripe for review.

## II.

Before it may turn to the merits of the Parishioners' claims, the Court must first confirm its subject matter jurisdiction over the case. The Current Leaders argue that the First Amendment prohibits judicial resolution of the parties' dispute. Defs.' Mot. at 16. They thus seek dismissal under Federal Rule of Civil Procedure 12(b)(1).

To survive a motion to dismiss under this rule, the Parishioners bear the burden of establishing that the Court has subject matter jurisdiction over their claims. *See Moms Against Mercury v. FDA*, 483 F.3d 824, 828 (D.C. Cir. 2007). In conducting its review, the Court may consider "the complaint supplemented by undisputed facts plus the [C]ourt's resolution of disputed facts." *Herbert*, 974 F.2d at 197. It accepts as true all factual allegations in the

complaint. *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007). It also gives the Parishioners "the benefit of all favorable inferences that can be drawn from the alleged facts." *Id*.

At this early stage, the Parishioners have partially met their burden of establishing the Court's jurisdiction. Generally, the First Amendment bars courts from adjudicating matters of "ecclesiastical cognizance." *See Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 698 (1976). To allow otherwise would create a "substantial danger that the State will become entangled in essentially religious controversies" or that it will "intervene on behalf of groups espousing particular doctrinal beliefs." *Id*. at 709.

But there are narrow exceptions. Courts may resolve church property disputes to which they can apply "neutral principles of law." *Presbyt'n Church in the U.S. v. Mary Eliz. Blue Hull Mem. Presbyt'n Church*, 393 U.S. 440, 449 (1969). And the Supreme Court has suggested that "marginal" civil court review may be appropriate where fraud or collusion underlies the actions of a church or its members. *See Milivojevich*, 426 U.S. at 711-13.

Examined in the light most favorable to the Parishioners, some of their claims are capable of resolution using secular legal principles.[3] Counts I-III of the First Amended Complaint, for instance, allege civil RICO violations. Am. Compl. at 40-43. The Parishioners

---

[3] The Current Leaders suggest that, because of the First Amendment concerns raised, a complaint challenging church action is subject to a heightened pleading requirement. *See* Defs.' Reply, ECF No. 17, at 12-13. They cite a D.C. Court of Appeals case for this proposition. *See id*. (discussing *Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith v. Beards*, 680 A.2d 419 (D.C. 1996)).

Neither the Current Leaders nor the *Bible Way* decision identify binding precedent that suggests the existence of a heightened pleading standard. That said, the Court agrees that where judicial review of inherently religious matters is a possibility, careful review of the pleadings is required. And, in any event, the Parishioners' factual allegations require "closer scrutiny" under a Rule 12(b)(1) motion than under motions to dismiss for failure to state a claim. *See Wright*, 503 F. Supp. 2d at 170. The Court thus applies this level of scrutiny to assess the Parishioners' claims.

argue that the Current Leaders illegally took control of the Church and its assets. They purportedly did so by falsely "promis[ing] that a vote to dismiss the Serving Board would be held." *Id*. at 38. No vote occurred, and the Current Leaders instead dismissed the Board through "unilateral action." *Id*. at 39. They thus took "effective control of the Church through false or fraudulent pretenses." *Id*.

The Parishioners do not ask the Court to reinstate the Church's former Board of Trustees. *Id.* at 40-43.[4] Nor do they seek resolution of any questions about the control or leadership of the Church. *Id*. Instead, they seek money damages under the RICO provisions for civil remedies, 18 U.S.C. § 1964. *Id*.

As pleaded, these claims do not "turn on the resolution by civil courts of controversies over religious doctrine and practice." *Presbyt'n Church in the U.S.*, 393 U.S. at 449. Rather, they involve the "narrow rubrics of 'fraud' or 'collusion'" that may permit "marginal civil court review" when "church tribunals act in bad faith for secular purposes." *Milivojevich*, 426 U.S. at 713. At this stage of the litigation, proceeding to the merits of these claims would not improperly entangle the Court in an essentially religious controversy.

Counts XI and XII, which allege breaches of fiduciary duties, also survive the Current Leaders' jurisdictional challenge. The Parishioners claim that the Church is a "non-profit member corporation organized under the laws of the District of Columbia." Am. Compl. at 27. Under D.C. law, a board of trustees may owe a fiduciary duty of loyalty to the corporation and its members. *See, e.g.*, *Willens v. 2720 Wis. Ave. Co-op. Ass'n, Inc.*, 844 A.2d 1126, 1136 (D.C.

---

[4] A group of Parishioners sued some of the Current Leaders in the Superior Court for the District of Columbia claiming that the removal of the former Board was invalid under the Church's bylaws. *See* ECF No. 9-2 at 4. The trial court ruled against them, and their suit is now pending appeal before the D.C. Court of Appeals. *See* ECF No. 9-5 at 2-57.

2004).  Both Counts XI and XII allege a breach of this duty by the Church's new Board.  Am. Compl. at 51-53.

These claims could, in theory, be resolved through application of neutral principles of corporate law.  *See, e.g.*, *Jones v. Wolf*, 443 U.S. 595, 607-08 (1979) (discussing the potential resolution of a church dispute using a neutral "presumptive rule of majority representation").  These principles may include, for example, generally applicable rules about when a fiduciary duty of loyalty is owed or whether a corporation can remove the duty of loyalty through its charter or bylaws.  So considering the merits of these claims at the motion to dismiss stage would not violate the First Amendment.

The Parishioners' remaining allegations, however, must be dismissed for lack of jurisdiction.  Counts IV-VII allege negligent and intentional infliction of emotional distress.  Am. Compl. at 44-47.  Count XIII alleges negligence.  *Id*. at 54.  Central to these claims is the Parishioners' contention that the "effective denial" "of [Parishioners'] ability to worship at the Church proximately caused the [Parishioners] serious and verifiable emotional distress."  *See id*. at 44-47.

Whether someone may worship at a church is plainly a matter of ecclesiastical cognizance.  *See Burgess v. Rock Creek Baptist Church*, 734 F. Supp. 30, 33 (D.D.C. 1990) ("[T]his Court must not interfere with the fundamental ecclesiastical concern of determining who is and who is not [a] Church member.").  Indeed "exclusion from a religious community, is not a harm for which courts can grant a remedy."  *Id*.  To hold otherwise would risk entanglement in a fundamentally religious endeavor—defining and applying the requirements of church membership.  Excommunication has been practiced by churches since biblical times.  *See* 1

Corinthians 5:13 (NIV) ("Expel the wicked person from among you.").  It is not for civil courts to question the propriety of ecclesiastical discipline.

During oral argument, the Parishioners' counsel suggested that "our state law claims are based upon a very simple definition of [Church] membership that does not really go to the [Church's] bylaws."  Hr'g Tr. 50:23-25.  Instead, these claims invoke "membership, the way it has been practiced," which "involved the right to vote on budgets" and which "means ownership" in the Church.  *Id*. at 50:25-51:3.  But without resort to plausibly secular governance documents—like an entity's bylaws—the Court is even less convinced that it can identify neutral principles of law that it can use to define the Parishioners' membership rights in the Church.  Because the Court cannot determine whether the Parishioners were rightly excluded from the Church, it cannot assess the emotional distress that may have resulted from this exclusion.

Similarly, Counts XIII, IX, and X must be dismissed.  In these counts, the Parishioners allege that they "made regular dues contributions towards the Church's operating expenses and reserve funds."  Am. Compl. 31.  They contend that the Current Leaders have engaged in conversion of these contributions by depriving the Parishioners of their right to vote on how the monies are used.  *Id*. at 48-49.  They also allege unjust enrichment and ask the Court to place the Church's assets into a constructive trust.  *Id*. at 50.

Judicial review of these claims would fall afoul of the First Amendment.  How a church spends worshippers' contributions is, like the question of who may worship there, central to the exercise of religion.  And placing its assets in trust for the Parishioners at the expense of the Current Leaders would constitute an impermissible judicial interference with the Church's ability to make governance and spending decisions.  Indeed, evaluating the Parishioners' claims would require the Court to decide who is rightfully empowered to make financial decisions for the

Church.  The Free Exercise Clause requires that the Court to decline to do so.  *Accord Nunn v. Black*, 506 F. Supp. 444, 446 (W.D.Va. 1981) (declining on First Amended grounds to hear the claims of former parishioners who alleged, among other things, that they "contributed considerable sums of money to the construction, maintenance, and upkeep of the Church property" and that "the acts of the defendants in the expulsion" of the parishioners "denied [them] of their beneficial interest in the Church without due process of law").

During oral argument, the Parishioners' counsel suggested that "fairness and equity" require that the money the Parishioners contributed to the Church should be returned to them "at least in proportion to what they paid in."  Hr'g Tr. 15:8-11.  But the Parishioners cite no authority for the extraordinary proposition that donations to a non-profit corporation vest the contributors with any rights to those funds.  And they identify no neutral principles of law the Court may use to determine whether contributions to a church create such rights.

Ultimately, in the 12(b)(1) context, the burden is on the Plaintiffs to show the Court has jurisdiction over their claims.  *Commonwealth v. U.S. Dep't of Educ.*, 340 F. Supp. 3d 7, 12 (D.D.C. 2018) (noting the court "presumes that it lacks jurisdiction unless the contrary appears affirmatively from the record").  They have not met this burden.

The Parishioners' arguments to the contrary are unpersuasive.  True, courts have resolved church property disputes "without resolving underlying controversies over religious doctrine."  Pls.' Opp. to Mot. to Dismiss ("Pls.' Opp."), ECF No. 16, at 11.  But these cases show the shortcoming of the Parishioners' claims.

In *Minker v. Baltimore Annual Conference of United Methodist Church*, for instance, a Methodist minister sued a church, alleging age discrimination and breach of contract.  894 F.2d 1354, 1356 (D.C. Cir. 1990).  The D.C. Circuit affirmed a dismissal of the age discrimination

claim on First Amendment grounds. *Id*. But it allowed one of the contract claims to move forward. *Id*. That claim was on firmer footing than any here, though.

The minister had alleged that a district church superintendent breached an oral contract to find him a more suitable congregation. *Id*. at 1355. The court found that, "[a]s a theoretical matter, the issue of breach of contract can be adduced by a fairly direct inquiry into whether [the minister's] superintendent promised him a more suitable congregation, whether [the minister] gave consideration in exchange for that promise, and whether such congregations became available but were not offered to [him]." *Id*. at 1360. It therefore concluded that judicial review of this discrete claim "will not necessarily create an excessive entanglement" with the exercise of religion. *Id*. Even then, the court cautioned that the minister was only "entitled to prove up his claim of breach of an oral contract to the extent that he can divine a course clear of the Church's ecclesiastical domain." *Id*. at 1361.

Unlike in *Minker*, there is no "fairly direct inquiry" the Court can use to resolve the Parishioners' broad tort claims. Rather, review of these allegations would require delving into the Church's practices and customs. And it would inevitably invoke issues that are "close to the core of ecclesiastical concern." *Burgess*, 734 F. Supp. at 34. The Parishioners allege harm, for example, to their "spiritual and emotional well-being" that "was necessarily implicated by their close and devout relationship with the Church." Am. Compl. 44. The First Amendment prohibits review of such claims. The Court will therefore dismiss the Parishioners' non-RICO claims, except for those alleging breach of a fiduciary duty, for lack of subject matter jurisdiction.

### III.

While the Parishioners' RICO and fiduciary duty claims overcome the jurisdictional hurdle, they fail to clear the Current Leaders' remaining challenges.

### A.

Consider first the RICO allegations. The Parishioners allege a conspiracy to violate 18 U.S.C. §§ 1962(b) and (c). The former section makes it unlawful to acquire control of an enterprise "through a pattern of racketeering activity." 18 U.S.C. § 1962(b). Similarly, the latter makes it unlawful for an employee or associate to participate in the enterprise's affairs "through a pattern of racketeering activity." *Id*. § 1962(c). "[C]entral to the Parishioners' RICO counts is § 1962(d), which makes it unlawful for persons to 'conspire to violate' subsections (b) and (c)." Pls.' Opp. at 14 (quoting 18 U.S.C. § 1962(d)).

As the statutory text makes clear, to bring a successful claim under these sections, a plaintiff must allege a "pattern of racketeering activity." A "pattern" requires at least two predicate acts of racketeering activity. *Salinas v. United States*, 552 U.S. 52, 62 (1997). And "racketeering activity" encompasses many nefarious acts, including mail and wire fraud. *See* 18 U.S.C. § 1961(1). Here, the Parishioners base their RICO claims on alleged mail and wire fraud conducted by the Current Leaders to gain control of the Church. *See* Am. Compl. 36-43; Pls.' Mot. at 14 (noting that racketeering activity "may be based—as here—on mail fraud and wire fraud).

The Current Leaders seek dismissal of these claims for two reasons. First, they contend that the Parishioners have failed to plead their allegations of fraud with sufficient particularity, as required by Federal Rule of Civil Procedure 9(b). Second, they suggest that the Parishioners have failed to state legally cognizable claims and that these allegations should therefore be

dismissed under Rule 12(b)(6). Both arguments are correct. And each serves as an independent basis to dismiss the Parishioners' claims.

**1.**

Rule 9(b) states that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). A party pleading fraud must therefore "state the time, place[,] and content of the false misrepresentations, the fact misrepresented[,] and what was retained or given up as a consequence of the fraud." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994).

Allegations of fraud lie at the heart of the Parishioners' RICO claims. They suggest that the Current Leaders conspired to take control of the Church "through false or fraudulent pretenses, representations[,] and/or promises." Am. Compl. 39; *see also id.* at 41-42. Rule 9(b) therefore applies to their pleadings.

The Parishioners' protestations to the contrary are misguided. To begin with, during oral argument they conceded that "fraud needs to be pled with particularity," and that, "because of the fraud allegation[s]" in their Complaint, they must plead the fraud with particularity. Hr'g Tr. 22:22-23:14. They also agreed that "whether or not 9(b) applies," they "needed to plead fraud with particularity." *Id*. at 24:1-7. In other words, the Parishioners appear to concede that Rule 9(b)'s particularity requirement—or its functional equivalent—applies here.

Even so, their brief suggests, citing only an out-of-circuit case, that "conspiracy claims have not been held to the Rule 9(b) pleading standard." Pls.' Opp. at 13 (citing *S. Broward Hosp. Dist. v. MedQuist Inc.*, 516 F. Supp. 2d 370, 393 n.14 (D.N.J. 2007)). Perhaps. But the plain meaning of Rule 9(b) requires that any claim that alleges "fraud or mistake" must be "state[d] with particularity." Fed. R. Civ. P. 9(b). Nothing in the text of the rule suggests that a

claim alleging conspiracy to commit fraud is immune from this requirement.  *See, e.g.*, *FC Inv. Grp. LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1098 (D.C. Cir. 2008) (noting, in the context of a claim alleging conspiracy to commit civil fraud, that a plaintiff must "plead with particularity the conspiracy as well as the overt acts . . . taken in furtherance of the conspiracy").

And where a RICO claim is based on predicate acts involving fraud, courts have routinely applied Rule 9(b).  *See, e.g.*, *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172 (2d Cir. 1999) ("Federal Rule of Civil Procedure 9(b) states that in averments of fraud, 'the circumstances constituting fraud . . . shall be stated with particularity.' This provision applies to RICO claims for which fraud is the predicate illegal act."); *Wall v. Michigan Rental*, 852 F.3d 492, 496 (6th Cir. 2017) (applying Rule 9(b) to allegations of wire and mail fraud).  In short, the Court finds that because the Parishioners' claims include allegations of fraud, they must state the circumstances of this fraud with particularity.

They fail to do so.  Count I, for example, suggests that the Current Leaders conspired to use "false or fraudulent pretenses" to obtain control of the Church.  Am. Compl. 36.  But beyond this conclusory statement, it offers no further specifics about this alleged fraud.  Instead, it contends that

- The Current Leaders "provided broad and repeated notice to all Church Members" of their "intention to hold a vote to dismiss the elected members of the Board of Trustees" and replace them with an interim Board "until a new Board could be elected."  Am. Compl. 36;

- This intention to hold a vote was "articulated in a written position statement that was read aloud to the General Assembly of the Church on August 30, 2015."  *Id*. at 37;

- This intention was reiterated at least twice by the Church's clergy and other Current Leaders. *Id*.;

- But "no such vote was conducted. Instead Defendant Habte 'announced' that [the Current Leaders] along with other groups within the Church 'had decided to dismiss the eight elected members of the [Board of Trustees] and replace them with an interim committee until a new Board could be elected.'" *Id*. at 38.

These allegations fail to identify any fraud, much less state fraud with particularity. Read most logically, they suggest that the Current Leaders promised the Church a vote that never occurred. But a broken promise alone is not necessarily fraudulent. And, without more specificity, the Court cannot reasonably infer that the Current Leaders had an intent to deceive or misrepresent when making statements about a forthcoming vote.

Indeed, the remaining allegations in Count I only reinforce this conclusion. The Parishioners suggest that the Current Leaders "regularly discussed" their desire to "take control of the Church on Abyssinia Radio," a local station catering to the Ethiopian community. *Id*. at 37. And the Current Leaders purportedly "held numerous meetings in person or by telephone" to "devise a scheme to obtain control of the Church." *Id*.

These allegations are at best inconclusive regarding fraud. Airing a grievance over the radio is not a fraudulent act. Indeed, this allegation suggests the intended takeover was open and notorious, not clandestine and duplicitous. Nor is "scheming" to effectuate a change in organizational leadership a fraudulent act. After all, holding meetings, publicly criticizing leaders, and discussing a change through elections—all legal acts—are forms of "scheming." Simply put, Count I provides ample detail about various statements, representations, meetings,

and actions. But it fails to provide any particularity about the time, place, or content of any *fraudulent* statement.

Counts II and III suffer from the same defect. Count II describes the "Individual Current Leaders" as "co-conspirators" in "the scheme to acquire and maintain" control of the Church. Am. Compl. 40-41. But it offers no details about how these Current Leaders joined in the alleged conspiracy, their roles in perpetrating any fraud, or the time or place of any fraudulent misrepresentations they may have made.

Count III alleges that the Current Leaders "regularly solicited" "contributions from members of the congregation" while "[k]nowing that they planned to acquire control of the Church" and its assets. *Id*. at 42. The Parishioners describe this as conversion "by fraud." *Id*. But the Parishioners identify no specific false representations or promises made by any of the Current Leaders to solicit these contributions.

In fact, during oral argument, the Parishioners suggested that these contributions went into a "building fund." Hr'g Tr. 13:9-16. And this fund, they conceded, is "frozen right now" and "was frozen by the [District of Columbia's] Superior Court." *Id*. at 13:21-24. It is thus unclear what harm the Parishioners allege about the contributions they made, as these contributions remain frozen at the direction of the Superior Court.

Contrast these allegations with those raised in a similar case. In *Jericho Baptist Church Ministries, Inc. (District of Columbia) v. Jericho Baptist Church Ministries, Inc. (Maryland)*, 223 F. Supp. 3d 1 (D.D.C. 2016), the court also considered RICO claims. There, like here, the plaintiff alleged "in essence, a scheme by the Individual Current Leaders to usurp the corporate identity and assets" of a church. *Id*. at 8. But the plaintiff made more detailed contentions. It alleged that the defendants conspired to fraudulently secure the resignations of two named board

members and excluded a third from board meetings.  *Id*.  The defendants also purportedly

"surreptitiously reconstitute[d]" the board without notice to the former members.  *Id*.

One defendant allegedly "made cash withdrawals from [the church's] bank accounts,

wrote checks to herself or her husband, or made credit card payments totaling nearly $85,000 for

her personal use."  *Id*.  Another defendant "received nearly $250,000 in unexplained payments"

from the church's corporate bank accounts.  *Id*.  The court found that, based on these claims, the

plaintiff had sufficiently alleged civil RICO violations.  *Id*.  As even this cursory review makes

clear, the vague and generalized contentions the Parishioners offer here fall far short of the

particularity that courts have typically required for fraud claims.

More still, mail and wire fraud serve as the required predicate acts for the Parishioners'

RICO claims.  *See* Am. Compl. 36-43.  But they fail to allege any false statements transmitted

using the Postal Service, radio, wires, or television.  True, the Parishioners do mention the

broadcasts on Abyssinia Radio.  Am. Compl. 37.  But they contend only that the Current Leaders

"regularly discussed the need to replace the [Board of Trustees] and thereby take control of the

Church."  *Id*.  Indeed, during oral argument, the Parishioners' counsel suggested that there was a

"fair inference" that the Current Leaders had used the mail and wires.  Hr'g Tr. 20:3-6.  That is

not nearly enough.  *See Bates v. Nw. Human Servs., Inc.*, 466 F. Supp. 2d 69, 89 (D.D.C. 2006).

Similarly, the Parishioners claim that the Current Leaders used the Postal Service to ask a

bank to freeze the Church's accounts.  *Id*. at 43.  But recall that the Parishioners' counsel

explained that, in fact, it was the Superior Court that has frozen these accounts.  Hr'g Tr. 13:21-

24.  In any event, they offer little more than this claim.  They fail to allege, for instance, that the

Current Leaders falsely claimed that they had the authority to make such a request.  Nor do they

suggest that the Current Leaders used false pretenses to induce the bank to freeze the accounts.

*See id.*  The Parishioners fail, in other words, to show how any mailings or transmissions "furthered the fraudulent scheme."  *Bates*, 466 F. Supp. 2d at 89.  Their allegations are far more nebulous than the embezzlement claims at issue in *Jericho Baptist*.  *See* 223 F. Supp. 3d at 8.

For these reasons, the Court finds that Counts I-III of the Parishioners' Amended Complaint fail to assert fraud with the particularity required by Rule 9(b).  It will therefore dismiss these claims.

## 2.

Even if Rule 9(b) does not require dismissal of the RICO claims, the Court finds that their dismissal is warranted under Rule 12(b)(6).  This rule permits dismissal when a plaintiff "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A valid claim must consist of factual allegations that, if true, "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Mere "labels and conclusions" or "naked assertion[s] devoid of further factual enhancement" are insufficient.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted).  Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.

Under Rule 12(b)(6), the Court must construe the Parishioners' allegations in the light most favorable to them and accept as true all reasonable factual inferences drawn from well-pleaded allegations.  *In re United Mine Workers of Am. Emp. Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994).  The Court need not, however, accept legal conclusions or conclusory statements as true.  *Iqbal*, 556 U.S. at 678.

Dismissal is warranted under Rule 12(b)(6) because the Parishioners have failed to allege a plausible pattern of racketeering activity.  First, recall that the Parishioners' mail and wire

fraud allegations identify no false statements or misrepresentations the Current Leaders made through use of the radio or the Postal Service.  Their "mere conclusory statements" are "not entitled to the assumption of truth."  *Id*.  The Court finds that these statements fail under the less exacting 12(b)(6) standard, too.

But even if the mail and wire fraud allegations are sufficiently pleaded, they do not save the Parishioners' claims.  Beyond multiple predicate offenses, a "pattern of racketeering activity" requires two additional elements: relatedness and continuity.  *See H.J. Inc. v. Nw. Bell Tele. Co.*, 492 U.S. 229, 239 (1989).  To prove continuity, it must be "shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity."  *Id*. at 240 (emphasis in original).

"Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement."  *Id*. at 242.  And RICO liability "depends on whether the threat of continuity is demonstrated."  *Id*.  *See also Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir. 1995) (holding that allegations of a "single scheme" that entails "but a single discrete injury" suffered by a "small number of victims" do not constitute a pattern of racketeering activity).  Something less is not enough.

A "single scheme" that threatens "no future criminal conduct" is precisely what the Parishioners have alleged here.  Taken as true, their allegations show that the Current Leaders wrested control of the Church and its assets away from the Board of Trustees through false promises and representations.  They did so over a roughly two-year period, with most of the relevant events occurring in August and September of 2015.  *See* Am. Compl. 32, 37.  That scheme ended when the Current Leaders ousted the Parishioners from the Church.

Contrast these allegations with an example discussed by the D.C. Circuit in *Edmondson & Gallagher*. There, the court reviewed a case in which the defendants allegedly "committed fraud by separate mailings to the tenants of over 8,000 apartments in dozens of apartment buildings . . . over a period of 13 years." *Edmondson & Gallagher*, 48 F.3d at 1265. These mailings were designed to fraudulently induce the sale of apartment units. *Id*. The court noted that, at the time of the lawsuit, "40% of the apartments remain[ed] unsold." *Id*. There was thus "reason to believe that more fraud would follow, creating an open-ended threat of continuity." *Id*. (cleaned up).

By contrast, the Parishioners here have alleged no continuing acts of wire or mail fraud. And they identify no other reasons to believe that the specter of RICO violations remains. They have therefore failed to plausibly allege the type of "long-term criminal conduct" that Congress was concerned with in enacting the RICO statute. *H.J. Inc.*, 492 U.S. at 242.

In sum, under either Rule 9(b)'s particularity standard or the familiar Rule 12(b)(6) standard, the Parishioners' RICO claims fail. The Court will therefore dismiss them.

**B.**

Having dismissed the RICO claims, the Court declines to exercise supplemental jurisdiction over the allegations that only invoke D.C.'s laws. The Court exercised federal question jurisdiction over the RICO claims, as it may do for claims arising under federal law. *See* 28 U.S.C. § 1331. But it requires another basis for resolving claims brought under local law. And it lacks diversity jurisdiction, because some Parishioners and Current Leaders are D.C. residents. *See, e.g.*, Am. Compl. 13, 28. Thus, the Court may hear only the remaining allegations through a discretionary exercise of its supplemental jurisdiction. *See* 28 U.S.C. § 1367.

District courts "may decline to exercise supplemental jurisdiction" over a state law claim for four reasons. *Id*. § 1367(c).[5] Two are relevant here. First, the Court may do so when it has "dismissed all claims over which it has original jurisdiction." *Id*. § 1367(c)(3). Second, it may also do so if a claim "raises a novel or complex issue of State law." *Id*. § 1367(c)(1).

The Parishioners agree that the RICO allegations are the only claims over which the Court has original jurisdiction. *See* Pls.' Opp. at 22 (noting that Section 1367(c)(3) would apply if the Court "acted to dismiss all claims over which it has original jurisdiction – the RICO claims"). Because the Court has dismissed the RICO counts, it finds that declining to exercise jurisdiction is proper. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) (noting that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims").

The Court also finds that the Parishioners' claims raise some "complex issue[s] of State law." 28 U.S.C. § 1367(c)(1). The Current Leaders suggest, for instance, that "whether a church has a fiduciary duty to its parishioners" is an unsettled legal question in the District. Defs.' Mot. at 31. The Parishioners do not disagree. *See* Pls.' Opp. at 22 n.4. The Court finds that the local courts are "better equipped to resolve the unsettled legal questions in this case." *Edmondson & Gallagher*, 48 F.3d at 1266. It will therefore decline to rule on the Parishioners' non-RICO claims, and dismiss the Amended Complaint.

---

[5] For the purposes of supplemental jurisdiction, the term "State" includes the District of Columbia. 28 U.S.C. § 1367(e).

## IV.

For these reasons, the Current Leaders' Motion to Dismiss will be granted.  The Parishioners' First Amended Complaint will be dismissed.  A separate Order accompanies this Opinion.

Dated: June 21, 2019

_____
TREVOR N. McFADDEN, U.S.D.J.