ALEMEWORK AMBELLU, *et al.*,

Plaintiffs,

v.

RE'ESE ADBARAT DEBRE SELAM
KIDIST MARIAM, THE ETHIOPIAN
ORTHODOX TEWHADO RELIGION
CHURCH, *et al.*,

Defendants.

Case No. 1:18-cv-02177 (TNM)

## <u>MEMORANDUM OPINION</u>

The Plaintiffs are former parishioners (the "Parishioners") of the Re'ese Adbarat Debre Selam Kidist Mariam Church. They claim that a group of current members and clergy (the "Current Leaders") conspired to take control of the Church, its operations, and its assets in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, and related torts. The Court granted the Current Leaders' Motion to Dismiss, finding, among other things, that the Amended Complaint failed to adequately plead RICO violations and that the Free Exercise Clause barred adjudication of other fundamentally religious matters. *See Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*, 387 F. Supp. 3d 71 (D.D.C. 2019) (*Ambellu I*).

The Court now must decide whether the proposed Second Amended Complaint ("SAC") meets the pleading requirements to move forward. Concluding that the SAC does not fix the failures of the original complaint, the Court will deny the Parishioners' Motion for Leave to File.

The Court will also deny the Parishioners' alternative request for limited jurisdictional discovery, and for the reasons below, the case will be dismissed.

## I.

In *Ambellu I*, the Court outlined the relevant history of the Church dispute. *See id.* at 76-77. In short, the Parishioners allege that for two years a committee of congregants "held a number of regular meetings for the express purpose of conspiring to devise a scheme to obtain control of the money and property of the Church by means of false or fraudulent pretenses, representations and promises." SAC, ECF No. 26-3, ¶ 176. Their planning culminated at the end of church services one Sunday in 2015, when the leader of the committee allegedly "announced that the serving members of the Church's Board of Trustees . . . were dismissed." *Id.* ¶ 177. The Parishioners argue that, "through false or fraudulent pretenses and representations," the Current Leaders appointed an interim Board that assumed control of the Church and has denied the Parishioners access to the Church and its assets ever since. *Id.* ¶ 176-87.

In response to *Ambellu I*, the Parishioners have pleaded additional facts hoping to establish a "pattern of racketeering activity" under RICO. *See* 18 U.S.C. § 1962. And they have provided the Church's Articles of Incorporation and two versions of its By-Laws to identify "neutral principles of law" the Court can apply without violating the First Amendment. *See* Pls.' Ex. B-D, ECF No. 26-3 at 69-132;[1] *Presbyt'n Church in the U.S. v. Mary Eliz. Blue Hull Mem. Presbyt'n Church*, 393 U.S. 440, 449 (1969). The Current Leaders renew their arguments from *Ambellu I* that the claims must be dismissed. Defs.' Mem. Opp. to Pls.' Mot. for Leave to File

---

[1] Citations are to the page numbers generated by this Court's CM/ECF system.

("Defs.' Opp."), ECF No. 27, at 1.  They contend that the "[SAC] presents nothing new" and oppose the Motion for Leave to File as "futile" because it cannot survive a motion to dismiss.  *Id.*

On RICO, the Current Leaders argue that the SAC still fails to satisfy Federal Rule of Civil Procedure Rule 9(b), which requires that "a party must state with particularity circumstances constituting fraud or mistake."  *See* Defs.' Opp. at 2-3.  They argue that not one of the "forty-one amended paragraphs provides any additional details concerning 'any false statements transmitted using the Postal Service, radio, wires, or television,' as [*Ambellu I*] explained was necessary."[2]  *Id*. at 3.  And as they argued previously, the Current Leaders claim that even if Rule 9(b) does not apply, the Parishioners' claims of fraud do not show "the continuity required to establish a pattern of racketeering activity."  *Id.* at 4.

As for the tort claims, the Current Leaders maintain that the Court lacks neutral criteria to adjudicate the dispute without "delving into the Church's practices and customs" that are "close to the core of ecclesiastical concern."  *Id.* at 5-6 (quoting *Ambellu I*, 387 F. Supp. 3d at 81).  The Current Leaders argue that the Parishioners' "attempt to re-characterize their claims by introducing By-Laws and Articles of Incorporation did not change their fundamental nature."  *Id.* at 6.  The Current Leaders argue these are still claims about denial of the Parishioners' "ability to worship," thus forbidden by the Free Exercise Clause.  *Id.  See also Burgess v. Rock Creek Baptist Church*, 734 F. Supp. 30, 33 (D.D.C. 1990) ("[T]his Court must not interfere with the fundamental ecclesiastical concern of determining who is and who is not [a] Church member.").

---

[2]  This misstates RICO's legal standard.  "Mailings and wire transmissions [must be] in furtherance of the overarching scheme to defraud," but "a mailing or wire transmission need not itself be fraudulent."  *See United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1117, 1118 (D.C. Cir. 2009).

## II.

On motion to amend a party's pleading, the Court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Congress intended Rule 15(a)(2) "to permit amendment broadly to avoid dismissal of suits on technical grounds." *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996). Courts must therefore read Rule 15(a)(2) as creating "a generally favorable policy toward amendments." *Hill v. U.S. Dep't of Def.*, 70 F. Supp. 3d 17, 19 (D.D.C. 2014). In other words, "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

But there are limits to that generally favorable policy. *See, e.g.*, *Klee v. Pittsburgh & W.V. Ry. Co.*, 22 F.R.D. 252, 255 (W.D. Pa. 1958) ("The requirement of judicial approval suggests that there are instances where leave should not be granted."). When a plaintiff fails to establish the facts or circumstances to make a claim, amendment is futile and the Court acts within its discretion to refuse amendment. *Foman*, 371 U.S. at 182. The same is true if a party has shown "repeated failure to cure deficiencies by previous amendments." *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (internal brackets omitted). Failure to plead fraud with particularity can establish futility. *Id.* at 1209. And the Court may also deny amendment because the resulting complaint "would not survive a motion to dismiss." *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996).

Federal Rule of Civil Procedure 12(b)(6) permits dismissal when a plaintiff "fail[s] to state a claim upon which relief can be granted." A valid claim must consist of factual allegations that, if true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Mere "labels and conclusions" or "naked assertion[s] devoid of further

factual enhancement" are insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Under Rule 12(b)(6), the Court must construe the Parishioners' allegations in the light most favorable to them and accept as true all reasonable factual inferences drawn from well-pleaded allegations. *In re United Mine Workers of Am. Emp. Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994). The Court need not, however, accept legal conclusions or conclusory statements as true. *Iqbal*, 556 U.S. at 678.

## III.

## A.

The SAC's Counts I through III allege a conspiracy to violate RICO, 18 U.S.C. § 1962(b) and (c). Section (b) makes it unlawful to acquire control of an enterprise "through a pattern of racketeering activity." 18 U.S.C. § 1962(b). Section (c) makes it unlawful for an employee or associate to participate in the enterprise's affairs "through a pattern of racketeering activity." *Id*. § 1962(c). And § 1962(d) makes it unlawful for persons to "conspire to violate" subsections (b) or (c). The statute creates a private cause of action available to "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c); *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (2006).

As the statutory text makes clear, to bring a successful claim under these sections, a plaintiff must allege a "pattern of racketeering activity." A "pattern" requires at least two predicate acts of racketeering activity. *Salinas v. United States*, 552 U.S. 52, 62 (1997). A plaintiff "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. N'west'n Bell Tel. Co.*, 429 U.S. 229, 239

(1989) (emphasis in original). Of the acts that encompass "racketeering activity" in 18 U.S.C. § 1961(1), the Parishioners base their RICO claims on alleged mail and wire fraud. SAC ¶ 218.

The elements of federal mail and wire fraud are "(1) a scheme to defraud, and (2) use of the mails or wires for the purpose of executing the scheme." *United States v. Alston*, 609 F.2d 531, 536 (D.C. Cir. 1979); *see also Johnson v. Computer Tech. Servs., Inc.*, 670 F. Supp. 1036, 1039 (D.D.C. 1987) (applying *Alston* to a civil RICO claim).

The first prong reaches "any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." *Carpenter v. United States*, 484 U.S. 19, 27 (1987). "The scheme to defraud must threaten some cognizable harm to its target." *United States v. Lemire*, 720 F.2d 1327, 1336 (D.C. Cir. 1983) (citing cases). Cash and in-kind bribery are tangible harms. *N'west'n Bell Tel. Co.*, 429 U.S. at 234. So are threats. *Fed. Info. Sys., Corp. v. Boyd*, 753 F. Supp. 971, 975 (D.D.C. 1990). Intangible harm can take the form of favors exchanged for false promises, or invasion of privacy through confidential information. *Lemire*, 720 F.2d at 1336.

Of course, there must also be a use of the mail or wires, where mail involves any delivery by the Postal Service or any other "private or commercial interstate carrier," and wire means transmittal "by means of wire, radio, or television communication in interstate or foreign commerce." 18 U.S.C. §§ 1341, 1343. Mailing and e-sending fraudulent tax returns involves use of the mail or wires. *Anza*, 547 U.S. at 454. Even mailings between conspirators "in furtherance of the overarching scheme to defraud" may qualify. *Id.*

Mail and wire fraud claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which requires that "the circumstances constituting fraud . . . be stated with particularity." *See Feld Entm't, Inc. v. ASPCA*, 873 F. Supp. 2d 288,

317 (D.D.C. 2012). A party pleading fraud must therefore "state the time, place[,] and content of the false misrepresentations, the fact misrepresented[,] and what was retained or given up as a consequence of the fraud." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994). Relevant circumstances of mail and wire fraud subject to this heightened standard include "the time, place and contents of [the] false representations." *Johnson*, 670 F. Supp. at 1039 (quoting *Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir. 1982)).

### B.

The SAC adds the following potentially relevant allegations: In the days that followed the Current Leaders' ascent to Church control, "people were dragged out of the Church 'like animals' and beaten," SAC ¶ 182; the Current Leaders forced the previous Board members to resign and then claimed that the governing By-Laws were invalid, leaving the Parishioners powerless to oppose the Current Leaders' actions, *id.* ¶ 201; the Current Leaders "consulted with non-members of the Church to grow their numbers and ensure they would be in the best position possible to allow for an unlawful takeover," *id.* ¶ 202; and the Current Leaders intentionally misled the Church members into believing they would hold a vote to replace the Board, despite "their true motives to seize the Church and its funds," *id.* ¶ 206.[3]

These are indeed specific factual allegations. But as the Court ruled before, Parishioners' failure is not a lack of particularity, it is that the facts they particularly allege do not constitute a RICO claim. Consider whether these new allegations advance the Parishioners' claimed RICO

---

[3] The Parishioners also allege several other claims they argue support their RICO claims. For example, they argue that the Church takeover occurred "through violence, intimidation, and outside of the proper channels articulated in the Articles of Incorporation and 1996 By-laws." Proposed SAC ¶ 211. The Court takes this as a recasting of ¶¶ 182 and 201 and sees no need to analyze it separately. Most of the other new paragraphs involve the "administrative framework of the Church governance," which the Parishioners urge the Court to consider for the RICO counts as well as the state tort claims. *See* Mem. of P. & A. in Supp. of Pls.' Mot for Leave to File ("Pls.' Mot for Leave to File"), ECF No. 26-2, 8. But the Court does not find any of the other new allegations to be relevant to the RICO claims because they do not implicate racketeering activity.

violations, or whether they simply "reassert[] a claim on which the court previously ruled." *Rumber v. District of Columbia*, 598 F. Supp. 2d 97, 102 (D.D.C. 2009).

The first of the new claims, alleging physical removal of congregants from the Church, is a recitation of their past claim that the clash over the Church turned violent and required intervention. *See* SAC ¶¶ 179, 180, 182. The new allegations notably fail to say who did the dragging and beating, but even if the culprits were the Current Leaders, assault is not a RICO predicate offense. *See Overnite Transp. Co. v. Int'l Bhd. of Teamsters*, 168 F. Supp. 2d 826, 843 (W.D. Tenn. 2001) ("[a]ssault neither expressly constitutes racketeering activity . . . nor falls within the generic designation of one of the enumerated racketeering activities") (citing cases).

Nor does this constitute a scheme to defraud. *See Boyd*, 753 F. Supp. at 977 (describing how defendants used illegally obtained information to threaten plaintiffs into taking corporate actions). These alleged acts of assault occurred *after* the Current Leaders had already dismissed the previous Board, not as a scheme to trick the existing Board members or the Parishioners. While troubling, these allegations of assault do not advance the Parishioners' claim that the Current Leaders engaged in "false or fraudulent pretenses, representations, or promises." *See Carpenter*, 484 U.S. at 27.

Similarly, the claim that the Current Leaders repudiated the Church By-Laws is not new. While the Parishioners have now incorporated the Church's corporate documents into the SAC, the Current Leaders' takeover and disregard for the previous Board's authority was both implicitly and explicitly stated in their FAC. *Compare* SAC ¶ 201, *with* FAC, ECF No. 6, ¶ 198 ("[Current Leaders] decided to dismiss the eight elected members . . . and replace them with an interim committee until a new Board could be elected."). The Current Leaders openly declared their opposition to the previous Board members. SAC ¶¶ 200-10. This is paltry grist for a fraud

case. There is no reasonable inference to suggest that the Current Leaders bribed Board members, for example, or that they obtained control through in-kind exchange or fraudulent inducement. *See N'west'n Bell Tel. Co.*, 429 U.S. at 234; *Lemire*, 720 F.2d at 1336. Tying the Current Leaders' actions to the By-Laws does not suggest it was a "scheme to deprive [the Parishioners] . . . by means of false or fraudulent pretenses, representations, or promises," *see Carpenter*, 484 U.S. at 27, and this claim involves no use of the mail or wires, *see Alston*, 609 F.2d at 536.

The next claim, that the Current Leaders "consulted with non-members of the Church to grow their numbers and ensure they would be in the best position possible to allow for an unlawful takeover," at first appears that it may do more to advance the ball. *See* SAC ¶ 202. But the Parishioners mischaracterize their own Exhibit F to make this claim, and the Court rejects their overreaching inference. [4] *See Kowal*, 16 F.3d at 1276 ("the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint"). Admittedly, the Current Leaders sought and welcomed the advice of non-members. Ex. F., ECF No. 26-3, at 142.

But the next paragraph in Exhibit F, which the Parishioners omitted from the SAC, clarifies that only Church members could participate in the committee that met to discuss perceived problems with the previous Board's conduct. Ex. F at 143. It says, "You have to be a member, but if people from outside come and give you advices [sic], we accept it." *Id.* This does not support the Parishioners' inference that the Current Leaders enlisted non-members to grow their numbers or artificially inflate their influence within the Church. *See* SAC ¶202. The

---

[4] Exhibit F is the deposition of Mr. Aklilu Habte, a Defendant here. An exhibit attached to a complaint becomes "part of the pleading for all purposes." Fed. R. Civ. P. 10(c). "A district court may consider a document that a complaint specifically references without converting the motion into one for summary judgment." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015).

opposite: it makes clear that only Church members could join the committee. There is also no plausible inference from this statement that non-members participated in any of the Current Leaders' decisions about the Board's dismissal and replacement. And there is certainly nothing fraudulent or nefarious in soliciting advice from non-members. Like the Parishioners' other added allegations, this one fails to advance the RICO claims.

In *Ambellu I*, the Court explained that the Current Leaders' alleged "broken promise" to hold a vote on a replacement Board was not fraudulent. 387 F. Supp. 3d at 83. The Court noted that "without more specificity, the Court cannot reasonably infer that the Current Leaders had an intent to deceive or misrepresent when making statements about a forthcoming vote." *Id.* In direct response, the Parishioners now claim that the Current Leaders intended to deceive the Church members about "their true motives to seize the Church and its funds." *Id.* ¶ 206. The Current Leaders argue in opposition that this "bare bones" allegation "does not identify . . . any facts supporting [the Parishioners'] conclusory allegation about [the Current Leaders'] intentions." Defs.' Opp. at 3. The Court agrees.

Rule 9(b) allows that because of the challenges of identifying another person's state of mind, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." For that reason, the Court looks at "the totality of the circumstances, including indirect and circumstantial evidence." *Philip Morris*, 556 F.3d at 1118. But the Parishioners must offer some facts to support their claim that the Current Leaders intended to deceive the Church members. Instead, the additional statement is simply a conclusory inference that the Current Leaders intended all along to withhold a vote. This does little more than offer "a legal conclusion couched as a factual allegation" and, in any event, "stops short of the line between

possibility and plausibility of entitlement to relief." *See Iqbal*, 556 U.S. at 678 (internal citations omitted).

So each of the Parishioners' new claims fail independently to establish their RICO allegations. More, they fail to do so collectively. As before, the Parishioners have provided "ample detail about various statements, representations, meetings, and actions. But [they fail] to provide any particularity about the time, place, or content of any *fraudulent* statement." *Ambellu I*, 387 F. Supp. 3d at 84 (emphasis in original). The Parishioners' deficiency is not that they have failed to plead in detail. Their deficiency is that they fail to allege a pattern of racketeering activity involving "(1) a scheme to defraud, and (2) use of the mails or wires for the purpose of executing the scheme." *Alston*, 609 F.2d at 536. The Parishioners describe a long and bitter contest between two opposing Church factions, but nothing in that dispute sounds in RICO.

## C.

Tellingly, the Parishioners cite no cases comparable to this one. Their closest case remains *Jericho Baptist Church Ministries, Inc. (District of Columbia) v. Jericho Baptist Church Ministries, Inc. (Maryland)*, 223 F. Supp. 3d 1 (D.D.C. 2016). There, like here, the plaintiff alleged "in essence, a scheme by the Individual Defendants to usurp the corporate identity and assets" of a church. *Id*. at 8. But even with the additional claims in the SAC, the Current Leaders' actions do not nearly match those of the *Jericho Baptist Church* defendants, who covertly conspired to secure two named board members' resignations, excluded another member from board meetings, and "surreptitiously reconstitute[d]" the board without notice to the former members. *Id*.

In contrast, the Current Leaders overtly discussed their dissatisfaction with the acting Board, aired their grievances over a community radio program, and then openly notified the

congregation one Sunday that the Board members were being dismissed. These are badges of an open power struggle, not a "scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." *Carpenter*, 484 U.S. at 27.

And nothing in the SAC touches the fraud and deceit found elsewhere in *Jericho Baptist Church*, such as alleged cash withdrawals from church bank accounts: nearly $85,000 in credit card payments for personal use and nearly $250,000 in "unexplained payments" from the church's corporate bank accounts. 223 F. Supp. 3d at 8. The closest analog here simply is not close: the Parishioners allege that the Current Leaders have frozen the Church's accounts and continue to deprive the Parishioners access. SAC ¶190. The Parishioners' counsel disavowed even this allegation at the motion hearing, conceding that the fund "was frozen by the [District of Columbia's] Superior Court." Hr'g Tr. 13:21-24. All told, the Parishioners' claims bear no resemblance to the pattern of racketeering activity in the Parishioners' closest supportive case. *See Jericho Baptist Church*, 223 F. Supp. 3d at 8.

The FAC contains many assertions that the Current Leaders conspired to take control of the Church "through false or fraudulent pretenses, representations and/or promises." FAC ¶¶ 167, 187, 199, 200, 212, 220. The SAC contains even more. SAC ¶¶ 176, 177, 200, 216, 217, 221, 223, 232, 240, 241. Rule 9(b) therefore applies to the Parishioners' pleadings. *Ambellu I*, 387 F. Supp. 3d at 82-83. But they have failed to "state the time, place[,] and content of the false misrepresentations, the fact misrepresented[,] and what was retained or given up as a consequence of the fraud." *See Kowal*, 16 F.3d at 1278.

To be sure, the SAC contains troubling allegations, including years of planning, broadcasts on a community radio station, the public ouster of the previous Board, and physical intimidation of congregants. *See* SAC ¶¶ 176, 177, 188, 210. But these claims describe a hostile

takeover, not acts of fraud.  The Parishioners were not defrauded of their positions in the Church; they were defenestrated through an open and notorious bid for Church control.  And while that conduct may amply justify claims under local law, it is not grounds for a RICO claim.  The SAC has added no new relevant information to alter the Court's previous finding.

The Parishioners have also failed to establish a pattern of racketeering activity involving at least two predicate acts.  *See Salinas*, 552 U.S. at 62.  A review of other cases in the Circuit shows that similarly-deficient complaints have been dismissed for failure to state a RICO claim. Most recently, in *DC2NY, Inc. v. Academy Bus, LLC*, the complaint was dismissed because with "only a single scheme, a single injury, and few victims, it is virtually impossible for plaintiffs to state a RICO claim."  No. 18-CV-2127 (RC), 2019 WL 3779571, at *4 (D.D.C. August 12, 2019) (quoting *W. Assocs. Ltd. Pshp. v. Market Square Assocs.*, 235 F.3d 629, 634 (D.C. Cir. 2001)).  And in *Ganzi v. Washington-Baltimore Regional 2012 Coalition*, the complaint alleged only a single scheme and too few victims to establish a pattern of racketeering activity.  98 F. Supp. 2d 54, 57 (D.D.C. 2000).

The Parishioners' claims here fare no better.  Even if the Current Leaders' actions were fraudulent (which the Court has expressly found they were not), those actions would still encompass a single scheme and a single injury.  And though they affected many victims, that alone cannot establish a pattern of racketeering activity.  The RICO claims fail.

### D.

As an alternative to leave to amend, the Parishioners ask for limited discovery to "develop facts that would satisfy the Court [of] its subject matter jurisdiction under RICO."  Pls.' Reply, ECF No. 28, at 6.  They contend that discovery into the Current Leaders' "e-mail, phone

and other communications" will establish the "precise names, dates and times" of the many meetings they allege will prove a "conspiracy to take over the Church." *Id.* at 6-7.

The Parishioners cite two cases in support of jurisdictional discovery, both inapposite. In the first case, the D.C. Circuit held that "precisely focused discovery aimed at addressing matters relating to *personal jurisdiction*" was called for to help "sort out" how the different defendants in the case might have different jurisdictional issues. *GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1352 (D.C. Cir. 2000) (emphasis added). The second case also granted limited discovery on personal jurisdiction "lest the defendant defeat the jurisdiction of a federal court by withholding information on its contacts with the forum." *Diamond Chem. Co., Inc. v. Atofina Chems., Inc.*, 268 F. Supp. 2d 1, 15 (D.D.C. 2003) (quoting *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996)).

The difference here, of course, is that the Parishioners seek jurisdictional discovery to show "*subject matter jurisdiction* under RICO," as opposed to the personal jurisdiction at issue in the cases they cite. *See* Pls.' Reply at 6 (emphasis added). And while there is precedent in this Circuit for jurisdictional discovery to show subject matter jurisdiction, it is a far less common application. The D.C. Circuit has held, for example, that discovery to reveal the "existence *vel non* of internal governmental policies" is an appropriately narrow search. *Ignatiev v. United States*, 238 F.3d 464, 467 (D.C. Cir. 2001). And this Court recently granted limited discovery in a similar context to determine whether a defendant's "internal policies and procedures" exist. *Chow v. WMATA*, --- F. Supp. 3d ----, No. 1:19-CV-01354 (TNM), 2019 WL 3304692, at *4 (D.D.C. July 23, 2019).

But whatever the context, "jurisdictional discovery cannot be based on mere conjecture or speculation." *FC Inv. Group LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1094 (D.C. Cir. 2008)

(internal citation omitted).  And jurisdictional discovery is not appropriate if it "would amount to nothing more than a fishing expedition."  *Bastin v. Fed. Nat'l Mortgage Ass'n*, 104 F.3d 1392, 1396 (D.C. Cir. 1997).

The Parishioners' request runs far afield of the narrow applications of jurisdictional discovery.  As the Court has noted, the Parishioners have pleaded their case in detail.  They do not lack for knowledge of the Current Leaders' conduct leading up to the disputed takeover.  They also possess discovery through the case in the Superior Court of the District of Columbia but are still unable to show the Court a path forward in RICO.  *See, e.g.*, *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 788 (D.C. Cir. 1983) (finding no abuse of discretion to deny jurisdictional discovery when a party has already had the opportunity to conduct discovery).  The Parishioners have not shown what narrowly-tailored discovery will yield, and instead they want to search broadly for "e-mail, phone and other communications among the Defendants."  Pls.' Reply at 6.  The Parishioners' SAC contains a detailed account of the Current Leaders' actions.  An opportunity for jurisdictional discovery will not help them, because that detailed account simply describes no RICO violation.

More, the request amounts to an end-run around well-established pleading standards.  As the Supreme Court stated in *Iqbal*, "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  556 U.S. at 678-79.  A plaintiff may not "use discovery to obtain the facts necessary to establish a claim that is plausible on its face pursuant to *Twombly* and *Iqbal* – even when those facts are only within the head or hands of the defendant."  *Felder v. WMATA*, 105 F. Supp. 3d 52, 59 (D.D.C. 2015) (citing *New Albany Tractor, Inc. v. Louisville Tractor, Inc.,* 650 F.3d 1046, 1051 (6th Cir. 2011)).

The Parishioners' well-pleaded facts "do not permit the court to infer more than the mere possibility of misconduct, [because] the complaint has alleged – but it has not shown – that [they are] entitled to relief." *See Iqbal*, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)); *see also Limestone Dev. Corp v. Vill. of Lemont, Ill.*, 520 F.3d 797, 803 (7th Cir. 2008) (Posner, J.) (applying *Twombly* to RICO case: "defendant should not be forced to undergo costly discovery unless the complaint contains enough detail, factual or argumentative, to indicate that the plaintiff has a substantial case"). The Court will not grant the Parishioners' request for jurisdictional discovery, even for a limited duration, in contravention of the Supreme Court's clear direction.

## IV.

Having found that the RICO claims cannot survive a motion to dismiss, the Court declines to exercise supplemental jurisdiction over the allegations that implicate the District of Columbia's laws. For the reasons explained in *Ambellu I*, the Court finds that declining to exercise jurisdiction is proper under 28 U.S.C. §§ 1367(c)(1), (c)(3). *See* 387 F. Supp. 3d at 86-87; *see also id.* at 79, n.4. The Plaintiffs raise various apparently weighty concerns about the takeover of their church, but these are best heard in local court. The Plaintiffs have not made out a federal case. Having reached this conclusion, the Court finds no need to re-visit the First Amendment implications of Counts IV-VII and XIII of the SAC.

For these reasons, the Plaintiffs' Motion for Leave to File Second Amended Complaint will be denied, and the case will be dismissed.  A separate Order accompanies this Opinion.

Dated: September 3, 2019

_____
TREVOR N. McFADDEN, U.S.D.J.